**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | * | Case No.   20-32740 (DRJ) |
| | * | |
| UNIT CORPORATION, et al., | * | Chapter 11 |
| | * | |
| Debtors. | * | Jointly Administered |

**TGS' OBJECTION TO CONFIRMATION OF**
**THE DEBTORS' FIRST REVISED PROPOSED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
[Related to ECF Nos. 163 & 175]

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

A2D Technologies, Inc., d/b/a TGS Geological Products and Services ("TGS") submits this objection to confirmation of the Debtors' First Revised Proposed Joint Chapter 11 Plan of Reorganization [ECF No. 163] (the "Plan"), filed herein by 8200 Unit Drive, L.L.C., Unit Corporation, Unit Drilling Colombia, L.L.C., Unit Drilling Company, Unit Drilling USA Colombia, L.L.C., and Unit Petroleum Company (collectively, "the Debtors"), and in support thereof, TGS respectfully submits as follows:

## I.     INTRODUCTION

1.       The Debtors' Plan provides generally for: (a) payment of all administrative and priority creditors in full; (b) holders of "Other Secured Claims", at the option of the Debtors and with the consent of the "Majority Restructuring Support Parties", receive payment in full of the "Allowed" amount of the claim, reinstatement of the claim, or return or abandonment of the collateral securing the claim; (c) holders of "Allowed Unit Corporation RBL Secured Claims" to receive a pro rata share of all revolving loans, term loans, letters of credit participations, and other fees under an agreed upon Exit Facility; (d) cancellation of the equity interests in the Debtors' parent company, Unit Corporation; (e) and holders of "Subordinated Note Claims" and "Allowed

GUC Claims" to be distributed the new common stock of the Reorganized Unit Corporation.

2.      On the Effective Date of the Plan, the terms of the current members of the Board of Directors of Unit Corporation and of the governing bodies of each of the debtor subsidiaries are to expire and the "New Boards" and officers of Reorganized Unit Corporation and each of its debtor subsidiaries are to be appointed. The New Board of Unit Corporation is to be comprised of seven (7) members, including the CEO, one (1) independent member mutually acceptable to the Debtors and the "Majority Consenting Noteholders", and five (5) members selected by the Majority Consenting Noteholders.

3.      As to executory contracts and unexpired leases, the Plan generally provides for the assumption or assumption and assignment to the Debtors "or their designated assignees" of all executory contracts not identified on a Schedule of Rejected Executory Contracts and Unexpired Leases. Nevertheless, to the extent any "rights or arrangements necessary or useful to the operation of the Reorganized Debtors' business" have not been assumed by the Debtors or are non-assumable under Section 365(c) of the Bankruptcy Code, including but not limited to non-exclusive or exclusive patent, trademark, copyright, maskwork, or other intellectual property licenses, those contracts, under the Plan, are to "pass through" the Debtors' Chapter 11 proceeding for the benefit of the Reorganized Debtors, except that "any Claim thereunder shall be treated in accordance with the distribution provisions in the Plan".

4.      Assumption by the Debtors of an executory contract is, under the Plan, to result in a full release and satisfaction of all Claims or defaults thereunder, whether monetary or non-monetary, including of "defaults of provisions restricting the change in control or ownership

interest composition or other bankruptcy or insolvency-related defaults," arising under any assumed contract prior to the date of assumption.

5.       Moreover, pursuant to the terms of the release and exculpation provisions of the Plan, all "Releasing Parties", upon the Effective Date of the Plan, are to release the Debtor, Reorganized Debtor and certain third parties from essentially all pre-confirmation acts, omissions and claims as well as those related to the Debtors' Bankruptcy, Plan and confirmation thereof. Included in these broad releases are claims of licensors of patent, trademark, copyright, maskwork, or other intellectual property, and creditors whose contracts are otherwise non-assumable under Bankruptcy Code Section 365(c), whose licenses, contracts and claims are supposed to "pass-through" the Debtors' Bankruptcy to the Reorganized Debtors pursuant to other provisions of the Debtors' Plan.

6.       As is shown below, the foregoing provisions of the Debtors' Plan, as well as others, are contrary to the United States Bankruptcy Code (the "Bankruptcy Code") and applicable Bankruptcy jurisprudence, thus rendering the Plan non-confirmable under Bankruptcy Code § 1129(a)(1).

7.       Specifically, a number of TGS's License Agreements with the Debtors contain valid "change in ownership or control" provisions that, by their terms and due to the material change in control of the Debtors contemplated in the Debtors' Plan, will result in the termination of the agreement upon the Effective Date of the Debtors' Plan. The Plan language purporting to nullify the change in ownership or control provision in TGS's License Agreements is contrary to both applicable Bankruptcy and non-Bankruptcy law.

8.     In addition or, alternatively, TGS's License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A). While some Bankruptcy jurisprudence suggests that under certain circumstances, a Plan may provide for the "pass-through" of such contracts to the Reorganized Debtors, the provision of the Plan requiring that any claim against the Debtors thereunder "be treated in accordance with the distribution provisions in the Plan" is contrary to settled Bankruptcy law.

9.     In addition, the release and exculpatory provisions of the Debtors' Plan are overbroad, non-specific, and contrary to other provisions of the Debtors' Plan.   Thus, they fail to meet the standards and requirements for such clauses that have been adopted in the Fifth Circuit.

## II.     THE PRE-BANKRUPTCY CONTRACTUAL RELATIONSHIP BETWEEN TGS AND THE DEBTORS

10.     TGS and its affiliated entities are geophysical services companies that are in the business, *inter alia*, of providing worldwide geoscientific data products and services to the oil and gas industry for the purpose of providing descriptions of subsurface geology for potential oil and gas exploration and/or production and other uses. These products include, but are not limited to, 2D, 3D and other types of seismic surveys and images, and/or well and petroleum data, which are generally offered to licensees on a multi-client basis for a limited term.

11.     The Debtors are affiliated entities that engage in the exploration, development, and production of oil and natural gas properties and provide contract drilling and midstream services to third parties. Unit Corporation is the ultimate parent company of each of the other Debtors and

4

owns 100% of the equity thereof.[1] Unit Corporation is a holding company with no independent assets or operations. It conducts its operations through its operating subsidiaries.[2]

12.     Prior to May 22, 2020 (the "Petition Date"), TGS licensed geophysical, well, petroleum and other data and information to one or more of the Debtors pursuant to one or more written license agreements (collectively, the "License Agreements").

13.     Specifically, by LOG-LINE Plus!® Operating Agreement dated May 5, 2006 (the "LOG-LINE Plus© License") between TGS and Unit Petroleum Company ("UPC"), TGS licensed certain proprietary petroleum data and derivatives thereof owned by it to UPC on a non-exclusive basis, for a designated period of time, subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms set forth therein.

14.     By Oyster Plan Addendum No. 4 to the LOG-LINE Plus© License effective May 31, 2018 between TGS and UPC (the "Oyster Plan Addendum"), TGS granted UPC a non-exclusive license to access and use certain TGS raster and smartRASTER® images from TGS' sR Database, for a designated period of time and subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms set forth therein and in the LOG-LINE Plus© License.

15.     By Master License Agreement for Geological Data No. 6019 dated April 18, 2019 between TGS and UPC (the "Master License"), TGS granted UPC a non-exclusive license, for a designated period of time and subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein, to use certain proprietary geological, well,

---

[1] *See* First Revised Disclosure Statement For The Debtors' First Revised Proposed Joint Chapter 11 Plan Of Reorganization [ECF No. 164] ("Disclosure Statement") at p. 20 of 335.
[2] *Id.* at p. 21 of 335.

petroleum and other data and derivatives owned by TGS, as well as presentation software owned or licensed by TGS, as set forth in Supplemental Agreements executed by the parties thereto.

16.    By Supplement No. 1 to the Master License dated April 18, 2019 between TGS and UPC, TGS granted UPC a non-exclusive license, for a designated period of time and subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein and in the Master License, to access through the TGS R360© e-commerce portal and use certain proprietary geological, well, petroleum and other data and derivatives owned by TGS, as well as presentation software owned or licensed by TGS.

17.    By Supplement No. 2 to the Master License dated April 18, 2019 between TGS and UPC, TGS granted the Debtor a non-exclusive license, for a designated period of time and subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein and in the Master License, to access and use certain well data products owned by TGS

18.    The LOG-LINE Plus© License between TGS and UPC, as amended by the Oyster Plan Addendum, provides, among other things, that:

    a.   The licenses are for a limited period of time and license use of TGS' data (the "Data") on a non-exclusive basis for UPC's internal use only;

    b.   TGS retains full title and ownership of the Data deposited into the database, the search engine and the database structure;

    c.   UPC is prohibited from reverse engineering the Data, compiling or distributing a data set, making any commercial use of the Data in the form of a sale, loan, trade, sharing arrangement or gift of the license, its use, or Data obtained with the license, or allowing any third party to digitize, copy, transform, or otherwise create copies or derivative products from the Data;

    d.   UPC is prohibited from transferring the license rights to the Data to a person that acquires, either directly or indirectly, UPC's equity interest or assets

6

whether such acquisition is in the form of s statutory merger, consolidation, share exchange, stock or asset sale, or otherwise, without the prior written consent of TGS; and

e. Upon any attempt to transfer the LOG-LINE Plus© License or Oyster Plan Addendum, or the underlying Data to a third party, whether by merger, assignment, consolidation, sublicense, bankruptcy or otherwise, the Addendum shall automatically terminate.

19.     The Master License, including Supplements No. 1 and No. 2 thereof, contain the following terms and provisions, among others:

a. The license is for a limited period of time and licenses use of TGS' data and interpretations (the "Materials") on a non-exclusive basis for UPC's internal use only;

b. UPC acknowledges that the Materials are constitute valuable, proprietary and highly confidential trade secrets and intellectual property of TGS, and are and shall remain owned by TGS;

c. UPC agrees to keep strictly confidential and to take appropriate steps to ensure that its employees and agents keep strictly confidential the Materials, and not to Show, allow the Use of, or Deliver the Materials to any other person[3]; and

d. Except as provided by the Master License or any Supplement, UPC is prohibited from transferring the license, any Supplement thereunder, or any of its rights and obligations under the license or any Supplement, or the right of Use of the Materials, whether by sale, assignment, sublicense, trade, lien, pledge, hypothecation or any other disposition or transfer, whether voluntary, by operation of law or by any other method.

20.     Moreover, the Master License, and Supplement Nos. 1 and 2 thereof, contain change in ownership or control provisions that automatically terminate the license in the event of a change of "Ownership" or "Control" of UPC, without the prior written consent of TGS. The

---

[3] The term "Show" is defined as meaning to give passive access to, or permit to be viewed, by a person. The term "Use" is defined as meaning to have, or be permitted access to, Material in a manner that allows a person to alter, or generate displays, interpretations or processings of, the Material. And the term "Deliver" is defined as meaning to give or permit access, or actual or constructive possession of Material to any extent equal to or greater than that by the definitions of Show and Use, respectively, including any physical transfer or electronic or other transmission of Material on or through any media or by any means whatsoever.   Master License, §§ 1.17, 1.20 and 1.7, respectively.

7

Master License and supplements provide that unless UPC has obtained the prior written consent of TGS, the Master License, supplements, and the right of Use of the licensed Materials thereunder "**shall automatically terminate at the time an Acquisition occurs**",[4] and define the term "Acquisition" as meaning "the event of an Acquiror, directly or indirectly, (i) acquiring all or substantially all of the assets of Licensee; or (ii) **Ownership or Control of Licensee**, whether accomplished voluntarily or through operation of law, by statutory merger, consolidation or share exchange, by stock or asset sale or purchase, or by any other transaction method . . ." (emphasis added).[5]

21.     Moreover, the Master License defines the terms "Ownership" and "Control" as follows:

   a.     "Ownership" means the "direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) outstanding common stock or other voting securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v) management or, (vi) interests in the profits".

   b.     "Control" means "the ability to, directly or indirectly, direct, manage or dictate the actions of, or determine the management of, the entity in question by any method, including, without limitation, by the election of members of the board of directors or other governing body of such entity, by having the ability to exercise control over a majority number of members of such governing body or through the Ownership of, or the exercise of voting or consensual right with respect to, the common stock, voting securities or other interest held in such entity. . .".[6]

## III.     THE BANKRUPTCY CASE AND PLAN TERMS

---

[4] Master License, § 7.1.
[5] *Id.* at § 7.2. The term "Acquiror" is defined as "a person (or group of persons acting in concert), who acquires, directly or indirectly, (i) all or substantially all of the assets of Licensee or (ii) Ownership or Control of Licensee". *Id.* at § 1.1.
[6] *Id.* at §§ 1.15 and 1.4, respectively.

22.     On the Petition Date, the Debtors each filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107 and 1108(a).

23.     On June 19, 2020, after filing initial versions of a plan and disclosure statement, the Debtors filed their First Revised Proposed Joint Chapter 11 Plan of Reorganization [ECF. No. 163] (the "Plan") and First Revised Disclosure Statement for the Debtors' First Revised Proposed Joint Chapter 11 Plan of Reorganization [ECF No. 164] (the "Disclosure Statement").

24.     Further, on June 19, 2020, the Court entered an Order (I) Conditionally Approving the Disclosure Statement; (II) Scheduling A Combined Plan And Disclosure Statement Hearing; (III) Approving The Solicitation Packages And Procedures; (IV) Approving The Form Of Ballots, Notices, And Other Solicitation Materials; and (V) Granting Related Relief [ECF. No. 175] (the "Disclosure Statement Order") which, among other things, scheduled a combined hearing on the adequacy of the Debtors' Disclosure Statement and confirmation of the Debtors' Plan for August 6, 2020, approved the Debtors' proposed Solicitation and Voting Procedures and various related notices, and set a number of Disclosure Statement and Plan approval and confirmation deadlines and bar dates.

25.     The Debtors' Plan is premised, at least in part, upon a restructuring and deleveraging of the Debtors' balance sheet by elimination of the Debtors' current equity interests and conversion of the Debtors' Subordinated Note Debt (totaling approximately $672.4 million)

and General Unsecured Debt (totaling approximately $22.9 million) into new equity interests in the Reorganized Debtors.[7]

26.     As part of the Plan, the Debtors propose, among other things, that all administrative expense and priority claims against Unit Corporation be paid in full; holders of "Other Secured Claims", at the option of the Debtors and with the consent of the "Majority Restructuring Support Parties", receive payment in full of the "Allowed" amount of the claim, reinstatement of the claim, or return or abandonment of the collateral securing the claim; holders of "Unit Corp. Allowed RBL Secured Claims" receive a pro rata share of all revolving loans, term loans, letters of credit participations, and other fees under an agreed upon Exit Facility and become an "Exit Facility Lender" in accordance with the "Exit Facility Documents"; the existing equity interests in Unit Corporation, be cancelled; and holders of "Subordinated Note Claims" and "Allowed GUC Claims" be distributed the new common stock of the Reorganized Unit Corporation.[8]

27.     As to holders of claims against UPC, the Plan provides, among other things, that each holder of an "Allowed UPC RBL Secured Claim" will receive its pro rata share of the revolving loans, term loans, letter-of-credit participations, and other fees under the Exit Facility, each holder of an "Allowed UPC Subordinated Notes Claim" will receive its pro rata share of the "UPC Subordinated Notes Equity Pool" – i.e., an allocation of the equity interests in Reorganized Unit Corporation, and each holder of an "Allowed UPC GUC Claim" will receive its pro rata share of the "UPC GUC Equity Pool" – i.e., an allocation of the equity interests in Reorganized Unit Corporation.[9]

---

[7] *See* Disclosure Statement [ECF No. 164] at pp. 11-16 of 335.
[8] *Id.*
[9] *Id.* at p. 10 of 335.

28.     Moreover, under the Plan, it is proposed that all executory contracts and unexpired leases be assumed or assumed and assigned to the Debtors "or their designated assignees", unless it has been identified on a Schedule of Rejected Executory Contracts and Unexpired Leases, previously rejected or assumed by "Final Order", the subject of a motion to reject pending on the "Effective Date" of the Plan, the subject of a motion to reject the effective date of which is after the Plan's Effective Date, previously expired or terminated, or designated to be rejected by the "Majority Consenting Noteholders".[10]

29.     To the extent any "rights or arrangements necessary or useful to the operation of the Reorganized Debtors' business" have not been assumed by the Debtors or are non-assumable under Section 365(c) of the Bankruptcy Code, including but not limited to non-exclusive or exclusive patent, trademark, copyright, maskwork, or other intellectual property licenses, those contracts, under the Plan, are to "pass through" the Debtors' Chapter 11 proceeding for the benefit of the Reorganized Debtors **except that "any Claim thereunder shall be treated in accordance with the distribution provisions in the Plan**" (emphasis added).[11]

30.     Moreover, the Plan provides that assumption by the Debtors of an executory contract "shall result in a full release and satisfaction of all Claims or defaults, whether monetary or nonmonetary, **including defaults of provisions restricting the change in control or ownership interest composition** or other bankruptcy or insolvency-related defaults," arising under any assumed contract prior to the date of assumption (emphasis added).[12]

31.     Objections to proposed cure amounts for assumption or assumption and assignment

---

[10] *See* Plan [ECF No. 163] at p. 64 of 97.
[11] *Id.* at p. 65 of 97.
[12] *Id.* at pp. 66-7 of 97.

of executory contracts, or to assumption or assumption and assignment generally, are reserved under the Plan for litigation or resolution post-confirmation.[13]

### IV.   TGS'S SPECIFIC OBJECTIONS TO THE DEBTORS' PLAN

A.   TGS's License Agreements are Executory Contracts and Assumption and Assignment of these Contracts is Prohibited By Bankruptcy Code § 365 (c)(1)(A) Absent TGS's Consent

32.   TGS's License Agreements are executory contracts within the meaning of Bankruptcy Code § 365 as, among other things, the Debtor, UPC has continuing confidentiality obligations to TGS under those agreements and restrictions upon use of the licensed Data and Materials while, at the same time, TGS has continuing obligations to allow UPC to use the materials and/or to defend legal proceedings arising out of the licensing thereof. *See, e.g., In re Aerobox Composite Structures*, LLC, 373 B.R. 135 (Bankr. D.N.M. 7/27/07) (patent and technology license agreement found executory based primarily on continuing obligations of both parties to maintain confidentiality); *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D.Fla. 3/1/06) (computer software licensing agreement held to be executory contract where the licensor had obligation to allow continued use by debtor and debtor had obligation to maintain confidentiality of software).  *See also In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 3/18/04) (computer software licensing agreement held executory due to confidentiality obligations); *In re Superior Toy & Mfg. Co.*, 78 F. 3d 1169 (7th Cir. 3/7/96) (trademark license found to be executory contract).

B.   The Change in Ownership or Control Provision in TGS's Master License and the Supplements Thereto is Valid and Enforceable, and the Plan Provision Purporting to Invalidate it is Contrary to Bankruptcy and Non-Bankruptcy Law.

33.   In order to assume an executory contract, a debtor is generally required to (a) cure

---

[13] *Id*., at p. 66 of 97.

any existing default under the contract or provide "adequate assurance" of a prompt cure; (b) compensate or provide adequate assurance that the debtor will compensate the other party to the contract for any actual pecuniary loss arising from the debtor's default thereunder; and (c) provide "adequate assurance of future performance" under the contract to the other party.   Bankruptcy Code § 365(b)(1).  These requirements apply to defaults that occur under executory contracts either before or after commencement of the case.  *In re Luce Industries, Inc*., 8 B.R. 100, 104 (Bankr. S.D.N.Y. 1980), *rev'd on other grds*., 14 B.R. 529 (S.D.N.Y. 1981).

34.     Moreover, it is well settled that an executory contract must generally be assumed in its entirety or not at all.   One cannot reject the burdens of an executory contract and accept only the benefits.  *In re E-Z Serve Convenience Stores, Inc*., 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003); *In re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. W.D.Tenn. 1980).

35.     As noted above, TGS's Master License with UPC and Supplements No. 1 and 2 thereto contain a change of ownership or control provision that terminates these License Agreements in the event of a change of ownership or control of UPC without the prior written consent of TGS.

36.     The Master License provide that unless UPC has obtained the prior written consent of TGS, the Master License, supplements, and the right of Use of the licensed Materials thereunder "**shall automatically terminate at the time an Acquisition occurs**",[14] and defines the term "Acquisition" as meaning "the event of an Acquiror, directly or indirectly, (i) acquiring all or substantially all of the assets of Licensee; or (ii) **Ownership or Control of Licensee**, whether accomplished voluntarily or through operation of law, by statutory merger, consolidation or share

---

[14] Master License, § 7.1.

Case 20-32740   Document 284   Filed in TXSB on 07/30/20   Page 14 of 27

exchange, by stock or asset sale or purchase, or by any other transaction method . . ." (emphasis

added).[15]

37.     The Master License, in turn, defines the terms "Ownership" and "Control" as

follows:

> a.     "Ownership" means the "direct or indirect rights in, or legal title to, greater
> than fifty percent (50%) of (i) outstanding common stock or other voting
> securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v)
> management or, (vi) interests in the profits".
>
> b.     "Control" means "the ability to, directly or indirectly, direct, manage or
> dictate the actions of, or determine the management of, the entity in question
> by any method, including, without limitation, by the election of members of
> the board of directors or other governing body of such entity, by having the
> ability to exercise control over a majority number of members of such
> governing body or through the Ownership of, or the exercise of voting or
> consensual right with respect to, the common stock, voting securities or
> other interest held in such entity. . ."[16]

38.     Change in ownership or control provisions of the type contained in the Master

License have been held to be valid and enforceable against a debtor.  *See, e.g.*, *In re Washington*

*Capital Aviation & Leasing*, 156 B.R. 167, 174 (Bankr. E.D.Va. 1993).

39.     Although 11 U.S.C. § 365(e) and (f) generally provide that *ipso facto* and anti-

assignment clauses in executory contracts can be stricken as contrary to the Bankruptcy Code, it

has been held that 11 U.S.C. § 365(e) and (f) do not operate to invalidate clauses that permit

termination of a contract upon a change in control of the debtor party.   *In re Washington Capital*

*Aviation & Leasing*, 156 B.R. at 174 (noting that the change in control provision at issue was

neither an *ipso facto* clause nor a non-assignment clause).

---

[15] *Id*. at § 7.2. The term "Acquiror" is defined as "a person (or group of persons acting in concert), who acquires,
directly or indirectly, (i) all or substantially all of the assets of Licensee or (ii) Ownership or Control of Licensee". *Id*.
at § 1.1.
[16] *Id*. at §§ 1.15 and 1.4, respectively.

40.     In any event, courts recognize that executory contracts should be evaluated on a case by case basis to determine the effect of enforcement of these types of provisions on both the debtor party and the non-debtor party, specifically including the extent of the economic detriment suffered by the non-debtor party. *See In re E-Z Serve*, 289 B.R. at 50 (noting that a bankruptcy court's "authority to excise a bargained for element of a contract is questionable" and that "modification of a nondebtor contracting party's rights is not to be taken lightly").

41.     Here, the change in ownership or control restrictions in the Master License are critical to TGS's business model as TGS makes a substantial investment in creating its own geological Materials and earns revenue by granting non-exclusive access to these Materials to multiple customers under restrictive license agreements.   If the change in ownership or control restrictions are not enforced, the value of those licenses will be severely diminished.   For this reason, the change in ownership or control provision in TGS's Master License is an essential, bargained-for element of TGS's agreements with UPC that should be enforced.[17]

---

[17] While perhaps not before the Court at this juncture, the evidence abundantly shows that the Debtors' Plan provides for a change in control as that term is defined in TGS's Master License. The Debtors' Disclosure Statement reflects that on the Petition Date, Unit Corporation had 54,625,240 shares of outstanding common stock. *See* Disclosure Statement [ECF No. 164] at p. 27 of 335. Approximately 33 % of the stock was owned by four (4) entities, FMR LLC, Dimensional Fund Advisers LP, Black Rock, Inc., and The Vanguard Group. See Form 10-K/A of Unit Corp. for the period ended 12/31/19 at p. 42, attached hereto as Exhibit "A." The identities of the remaining stockholders is unknown. Nevertheless, under the Debtors' Plan, the current owners of Unit Corporation are to lose most, if not all, of their equity interests and the holders of the Subordinated Note Claims and Allowed GUC Claims become the new owners of Unit Corporation. *See* Plan [ECF No. 163] at pp. 39-41 of 97. Further, on the Effective Date of the Plan, the terms of the current members of the Board of Directors of Unit Corporation and of the governing bodies of each of the other Debtors are to automatically expire and the "New Boards" and officers of Reorganized Unit Corporation and each of its debtor subsidiaries are to be appointed. The New Board of Unit Corporation is to be comprised of seven (7) members, including the CEO, one (1) independent member mutually acceptable to the Debtors and the "Majority Consenting Noteholders", and five (5) members selected by the Majority Consenting Noteholders. The term "Majority Consenting Noteholders" is defined in the Plan as meaning the same thing as it is defined in the Restructuring Support Agreement. *Id.* at p 16 of 97. The Term Sheet attached to the Restructuring Support Agreement, in turn, defines "Majority Consenting Noteholders" as the "Consenting Noteholders" holding a majority in dollar amount of the aggregate outstanding principal amount of the Subordinated Notes Claims held by all Consenting Noteholders. *See* Term Sheet attached as an Exhibit to the Restructuring Support Agreement [ECF No. 164] at p. 214 of 335. TGS has not been able thus far to determine the identities of the Majority Consenting Noteholders or even of the Consenting Noteholders in general, as the signature pages to the Restructuring Support Agreement filed into the

42.     Accordingly, the provision in the Debtors' Plan that purports to nullify change of ownership or control provisions such as are contained in TGS's Master License is contrary to Bankruptcy law and non-Bankruptcy law.   Moreover, to the extent the Plan provides for a change of ownership or control of the Debtors in violation of the change of ownership or control provisions of TGS's Master License and/or the Plan otherwise authorizes or enables the Debtors to assume (or assume and assign to third parties) TGS's Master License, and Supplements No. 1 and 2 thereto, without properly curing all defaults thereunder, including the Debtors' default under the change of ownership or control provision contained therein, the Plan further violates settled Bankruptcy law.   For both of those reasons, confirmation of the Debtors' Plan should be denied.

C.     <u>The Provision in the Debtors' Plan Purporting to Authorize the Debtors to Assume or Assume and Assign Essentially All Executory Contracts Not Identified on the Schedule of Rejected Executory Contracts to the Reorganized Debtors or their "Designated Assignees" Violates Established Bankruptcy Law.</u>

43.     Although Bankruptcy Code § 365(a) gives a debtor or trustee, with court approval, the right to assume (or reject) executory contracts, and Bankruptcy Code § 365(f) generally gives the debtor or trustee the power to assign executory contracts, Bankruptcy Code § 365(c)(1)(A) contains an exception to both of those grants of authority.   Bankruptcy Code § 365(c)(1)(A) provides that a trustee may <u>not</u> assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

>     (a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an

---

record along with the Debtors' Disclosure Statement have been excised. What is clear, however, is that upon the Effective Date of the Plan, rather than the Pre-Petition stockholders of Unit Corporation choosing the members of Unit Corporation's Board, and thus also of its subsidiary Debtors, the members of Unit Corporation's Board (and thus its subsidiaries) will be primarily chosen by the Majority Consenting Noteholders.

16

entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

i.  *Trade Secret Law is "Applicable Law" Preventing Assumption or Assumption and Assignment as Proposed by the Debtors in their Plan under § 365(c)(1)(A)*

44.     It has been held that the phrase "applicable law" as used in Bankruptcy Code § 365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law".   *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011).   TGS asserts that Texas and U.S. trade secrets laws constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuse TGS from accepting performance from or rendering performance to an entity other than UPC, thus precluding assumption or assumption and assignment of TGS's License Agreements without TGS's consent.[18]

45.     The Texas Supreme Court has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). It is axiomatic that the secrecy of a trade secret is of paramount importance for the information to maintain its value: trade secrets must necessarily remain secret to be useful to the owner. *See generally Rugen v. Interactive Bus. Sys., Inc*., 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ) ("[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret.")

46.     It has been uniformly held that seismic data is a protected trade secret under Texas law.   *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003).   *See also Musser David Land Co.*

---

[18] The License Agreements each stipulate that Texas law is to be the law governing the agreements.

*v. Union Pac. Res.*, 201 F.3d 561, 569 (5th Cir. 2000).   In determining that seismic data is considered a trade secret, the Texas Supreme Court has recognized that seismic data and other methods for obtaining subsurface geological information are widely considered trade secrets both within the oil and gas industry and at law. *See In re Bass*, 113 S.W.3d at 742. Further, the United States Bankruptcy Court for the Western District of Texas has also found subsurface data, including both seismic and microseismic data and well logs, to be entitled to trade secret protection under Texas law.   *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012).   This Court should follow the Texas Supreme Court, the Fifth Circuit and the Western District of Texas by finding that the geological Data and Materials licensed to UPC by TGS are likewise trade secrets.

47.   Indeed, in the Master License between TGS and UPC, UPC acknowledged and agreed that the Materials licensed to it thereunder, as well as under Supplements No. 1 and 2 thereto, constitute valuable, proprietary and highly confidential trade secrets and intellectual property of TGS.

48.   Under the Texas version of the Uniform Trade Secrets Act, an actionable misappropriation is considered to exist and may be enjoined when a disclosure or use of a trade secret occurs without the express or implied consent of the owner.[19]   Tex. Civ. Prac. & Rem. Code § 134A.002(3). Further, a person who, without the owner's consent, knowingly communicates or transmits a trade secret, is guilty of committing a felony.   *See* Tex. Penal Code § 31.05.

49.   Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action

---

[19] A trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Uniform Trade Secrets Act, § 1(4).

for trade secret misappropriation that in large part mirrors the Uniform Trade Secrets Act. The definition of the term "trade secret" in the Defend Trade Secrets Act ("DTSA") is similar to the definition found in the Uniform Trade Secrets Act, and the remedies set forth in the DTSA are in large part, similar to the state version.[20] *See* 18 U.S.C. § 1836 *et seq.* Further, while the DTSA creates federal jurisdiction over trade secret theft, it does not preempt state trade secret law and allows trade secret owners to pursue federal civil remedies as an alternative to or in addition to existing state remedies. 18 U.S.C. § 1838.

50.   Although there is no case law specifically discussing whether trade secret law is "applicable law" under § 365(c)(1)(A), the trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection to owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent.[21] Moreover, under both the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016, any transfer or use of a trade secret requires the express or implied consent

---

[20] On the other hand, the DTSA provides an ex parte seizure procedure for use where the party against whom the seizure is ordered "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person…." 18 U.S.C. § 1836(b)(2).

[21] *See e.g. In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015)("federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor"); *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996)(The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years"… free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents."); *In re Patient Educ. Media, Inc*., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997)("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent.")

of the owner thereof.   Thus, the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016 should be found to constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) that excuses TGS from accepting performance from or rendering performance under its License Agreements to entities other than UPC.

51.    Because TGS's License Agreements are protected under trade secret law, Bankruptcy Code § 365 (c)(1)(A) prohibits their assumption or assumption and assignment by the Debtors without TGS's consent.   As such, the provision of the Plan purporting to authorize the Debtors to assume TGS's License Agreements and all other executory contracts if not identified on the Debtors' Schedule of Rejected Executory Contracts, and purporting to authorize the Debtors to assume and assign those licenses to the Reorganized Debtors "or their designated assignees", violates Bankruptcy law.

D.    The "Pass-Through" Provision in the Debtors' Plan is Contrary to Law.

52.    Article VI, Section B of the Debtors' Plan provides, in pertinent part, that to the extent any "rights or arrangements necessary or useful to the operation of the Reorganized Debtors' business" have not been assumed by the Debtors or are non-assumable under Section 365(c) of the Bankruptcy Code, including but not limited to non-exclusive or exclusive patent, trademark, copyright, maskwork, or other intellectual property licenses, those contracts are to "pass through" the Debtors' Chapter 11 proceeding for the benefit of the Reorganized Debtors, except that "any Claim thereunder shall be treated in accordance with the distribution provisions in the Plan".[22]

53.    The foregoing provision of the Debtors' Plan is commonly known as a "pass-though" provision. It is based upon the "pass-through" doctrine (also known as the "ride through"

---

[22] *See* Plan [ECF No. 163], at p. 65 of 97.

20

doctrine), which is a judicially created doctrine with its roots in the former Bankruptcy Act of 1898 to the effect that if an executory contract was not assumed or rejected in a bankruptcy proceeding, it passes with the debtor's other property to the reorganized debtor.   *In re JZ L.L.C.*, 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007). *See also In re Hernandez*, 287 B.R. 795, 799 (Bankr. D.Ariz. 2002). The Fifth Circuit has indicated that the doctrine may still remain in effect in this circuit, although not in the specific context presented here.   *See, e.g., ASARCO, L.L.C. v. Montana Resources, Incorporated*, 858 F.3d 949, 959 (5th Cir. 6/2/17); *In re O'Connor*, 258 F.3d 392, 404 (5th Cir. 2001)(noting that the only cases applying the theory concerned assumable executory contracts).

54.     A number of courts have held that the pass-through doctrine is not something that can be made part of a plan of reorganization, but rather it is essentially a catch-all doctrine that applies only where the debtor fails to assume or reject the executory contract or otherwise deal with it in the plan.   *See, e.g., In re Hernandez,* 287 B.R. 795, (Bankr. D.Ariz. 2002) (the debtor may not treat an executory contract in a Chapter 11 plan and at the same time effect a ride through of that contract – these are inconsistent proposals).   To the contrary, section 365 remains the exclusive remedy for dealing with executory contracts in Chapter 11.   *In re MPF Holding U.S. LLS*, 2013 WL 3197658, *11-12 (Bankr. S.D.Tex. 2013).

55.     Here, the Plan expressly provides that Debtors intend to assume essentially all executory contracts to the extent not listed on the Debtors' Schedule of Rejected Executory Contracts and Unexpired Leases.[23]   That apparently includes TGS's License Agreements, although the Debtors, as of this date, have not yet filed their Plan Supplement containing their Schedule of Rejected Executory Contracts and Unexpired Leases and it is not known, accordingly, what the

---

[23] *Id.* at p. 64 of 97.

Debtors actually intend to propose regarding those licenses. Nevertheless, because the Plan contains a separate provision concerning the Debtors' proposed treatment of all of its executory contracts within the context of Bankruptcy Code § 365, the pass-through doctrine cannot apply to TGS's License Agreements or any other similar types of executory contracts, as they are already dealt with under another provision of the Plan.

56.     Even if the pass-through doctrine and the pass-through provision of the Debtors' Plan could apply to TGS's License Agreements as well as similar licenses of other parties, it has been uniformly held that pass-through cannot be a *de facto* assumption. *In re Hernandez*, 287 B.R. at 800. In other words, where a contract is not assumed and instead merely passes through to the reorganized debtor, the reorganized debtor is not entitled to the benefits afforded by Bankruptcy Code § 365, such as insulation from *ipso facto* provisions, the right to cure arrearages within a reasonable period of time notwithstanding what the payment terms of the contract may be, or other benefits provided under that section of the Code. *In re Hernandez*, 287 B.R. at 800. *See also In re Dehon, Inc.*, 352 B.R. 546, 565-6 (Bankr. D.Mass. 2006). Rather, while the pass-through doctrine allows the debtor to retain the benefits of the contract, the debtor also is subject post-bankruptcy to all of the contracts burdens. *In re Hernandez*, 287 B.R. at 801. Because the contract was not dealt with in the bankruptcy and has merely passed-through, it simply is unaffected by the bankruptcy. *ASARCO, L.L.C.*, 858 F.3d at 959; *In re O'Connor*, 258 F.3d at 405; *In re Avado Brands, Inc.*, 358 B.R. 868, 885 (Bankr. N.D.Tex. 2006)("there is no difference between a contract that, under § 365(c)(1), cannot be assumed, and one which is neither assumed nor rejected. Each is simply unaffected by the bankruptcy proceedings"). What this means is that after the bankruptcy proceeding, the non-debtor party may seek redress for any defaults by the

debtor under the contract outside of the bankruptcy proceeding as if the bankruptcy proceeding had never occurred.   *In re Dehon, Inc*., 352 B.R. at 561.

57.     Here, the pass-through provision of the Debtors' Plan is an impermissible attempt to create a *de facto* assumption of executory contracts that are supposed to be non-assumable and/or otherwise unaffected by the Debtors' Bankruptcy proceeding. This is because rather than leaving such contracts untreated by the provisions of the Plan and therefore unaffected thereby, the Debtors have, indeed, attempted to impose Plan treatment upon passed-through contracts. They did so by adding the proviso, after stating that certain types of executory contracts may pass-through to the Reorganized Debtors, that "any Claim . . . [under a contract that passes through to the Reorganized Debtors] shall be treated in accordance with the distribution provisions in the Plan".

58.     The Debtors cannot legally have it both ways. If the Debtors desire to apply the provisions of Bankruptcy Code § 365 to executory contracts such as TGS's License Agreements, they cannot, under Bankruptcy law, also attempt to obtain the benefits of the pass-through doctrine by including a pass-through provision in their Plan. In addition or, alternatively, if the Debtors are going to include a pass-through provision in their Plan, it cannot, under settled Bankruptcy law, require that claims arising from contracts that pass-through be governed by the distribution provisions of the Plan.   Because the Debtors have, the pass-through provision of the Debtors' Plan is contrary to law.

E.     <u>The Release and Exculpation Provisions in the Debtors' Plan are Overbroad and Contrary to Law</u>.

59.     The Debtors' Plan contains broad release and exculpation provisions that release the Debtors, the Reorganized Debtors and numerous third parties from a broad array of both pre and post-Petition claims, obligations, actions, and omissions.[24]

60.     Among other things, the release provision in the Plan releases the Debtor, its estate, and the Reorganized Debtors, from all "Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever . . . **that such Releasing Party . . . would have been legally entitled to assert . . . based on or relating to, . . . the Debtors . . . , the Reorganized Debtors,** their Estates, **the Debtors' in- or out-of-court restructuring efforts**, the Debtors' intercompany transactions, . . . any **Avoidance Actions**, **the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors** or the Reorganized Debtors, **the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan**, the **business or contractual arrangements between any Debtor and any Released Party, . . . the restructuring of any Claim or Interest before or during the Chapter 11 Cases,** . . . **the issuance or distribution of Securities or other property pursuant to the Plan,** . . . or upon any other **act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date** related or relating to the foregoing . . ." (emphasis added).

61.     The exculpation provision of the Plan, among other things, exculpates the Debtor and Reorganized Debtor **from liability for "any . . . Claim**, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability . . . **relating to any act or omission . . . arising out of, the Chapter 11 Cases, . . . the Disclosure Statement, the Plan**, the related agreements,

---

[24] *See* Plan [ECF No. 163] at pp. 83-85 of 97.

instruments, and other documents (including the Definitive Documentation) . . . **or the Restructuring**, or any related contract, instrument, release or other agreement or document . . . created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan. . ." (emphasis added).

62.     The Fifth Circuit takes a "very restrictive" approach to releases in bankruptcy cases. To that end, it has recognized that § 524(e) of the Bankruptcy Code generally prohibits non-consensual, non-debtor releases, and the Court has indicated that a plan containing such a release is non-confirmable. *See In re Vitro S.A. B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012), *cert. dismissed*, 569 U.S. 944 (2013), *citing In re Pac. Lumber Co.*, 584 F3d 229, 252 (5th Cir. 2009). Moreover, it has been held that a release provision will be found to be prohibited, thus rendering the plan non-confirmable, if the language of the release is vague, over broad or does not specifically set out who is affected by the release and the specific claims that are being released. *See, e.g., Hernandez v. Larry Miller Roofing, Incorporated*, 628 Fed. Appx. 281, 286-288 (5th Cir. 1/6/16); *In re Patriot Place, Ltd*., 486 B.R. 773, 821-821 (Bankr. W.D.Tex. 2013).

63.     The releases and exculpation provision contained in the Plan are vague, non-specific, and over broad in violation of Fifth Circuit requirements.  Nowhere does the release identify any specific claims intended to be released, or the identity of the specific parties who are to be releasing those claims.   Yet, to be effective, the Fifth Circuit has made it clear that a release must be specific in what it releases and may not contain generic boilerplate language as does the release proposed in the Debtors' Plan.  *Hernandez*, 628 Fed. Appx. at 287-288.

64.     Perhaps more significantly, the release and exculpation provisions are so over broad that they could be construed as barring TGS and other similarly situated licensors of Geological and Geophysical Materials, intellectual property, trade secrets, and copyrighted or patented

materials, whose licenses are supposed to "pass through" the Debtors' Bankruptcy to the Reorganized Debtors, from being able to assert rights, benefits and remedies contained in their licenses or under applicable law against the Reorganized Debtors.  As shown above, that would run contrary to the very purpose and intent of the pass-through doctrine.

## V.    <u>RESERVATION OF RIGHTS</u>

65.    TGS reserves the right to raise other objections it may have to confirmation of the Debtors' proposed Plan, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that they deem appropriate, including an objection to assumption or assumption and assignment of TGS's License Agreements.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, TGS prays that the Court deny confirmation of the Debtor's Plan, as written, and provide any other and further relief as is just and equitable.

Respectfully submitted,

/s/ Andrew A. Braun
ANDREW A. BRAUN
Texas State Bar No. 24061558
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana   70139-4800
Telephone:   (504) 561-0400
Facsimile: (504) 561-0700
Email: abraun@glllaw.com

*Counsel for A2D Technologies, Inc., d/b/a*
*TGS Geological Products and Services*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing pleading was served via electronic mail on the 30th day of July, 2020, upon all parties in interest listed on the ECF service list.

*/s/ Andrew A. Braun*